UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, for the Use and Benefit of Collins Plumbing, Inc., a California Corporation; COLLINS PLUMBING, INC.,<br><br>　　　　　　Plaintiffs,<br>v.<br>TURNER-PENICK JOINT VENTURE et al.,<br>　　　　　　Defendants.<br><br>AND RELATED COUNTER-CLAIMS AND CROSS-CLAIMS | Civil No. 3:11-cv-2834-GPC-MDD<br><br>**ORDER:**<br><br>**(1) DENYING MOTION FOR PARTIAL SUMMARY JUDGMENT BY TURNER-PENICK JOINT VENTURE AND SURETIES, (ECF NO. 124);**<br><br>**(2) DENYING MOTION TO STRIKE DECLARATION OF DAVID HOLLAND, (ECF NO. 139);**<br><br>**(3) GRANTING JOINT MOTION FOR LEAVE TO FILE EXTENDED REPLY BRIEF, (ECF NO. 141)** |

## **INTRODUCTION**

Before the Court in this construction-defect case is the Motion for Partial Summary Judgment filed by Turner-Penick Joint Venture ("Turner-Penick") and its sureties SafeCo Insurance Company of America, Liberty Mutual Insurance Company, Zurich American Insurance Company, Fidelity and Deposit Company of Maryland, and Federal Insurance Company (all five collectively, "Sureties"). (ECF No. 124.) Turner-Penick and the Sureties' move for partial summary judgment against California

Comfort Systems USA, Inc. ("Comfort Systems") on Comfort Systems' counterclaims against Turner-Penick and the Sureties for breach of contract, recovery under Miller Act payment bond, and quantum meruit. Comfort Systems has filed an opposition to Turner-Penick and the Sureties' Motion for Partial Summary Judgment, (ECF No. 128), and Turner-Penick and the Sureties have filed a reply, (ECF No. 137).[1] The Court finds Turner-Penick and the Sureties' Motion for Partial Summary Judgment suitable for disposition without oral argument. See CivLR 7.1.d.1. Having considered the parties' submissions and the applicable law, and for the reasons that follow, the Court will **DENY** the Motion for Partial Summary Judgment.

## BACKGROUND

**I.    Facts**

While the parties disagree as to the materiality of certain facts and/or the admissibility of certain evidence, the underlying facts of this controversy are largely undisputed. This case involves a dispute over the design and construction of an expansion to Camp Pendleton, a U.S. Marine Corps base in San Diego County, California. The Naval Facilities Engineering Command ("NAVFAC") administered, and is considered the "owner," of the expansion project.

The specific components of the expansion project at issue here are known as "Package 4" and "Package 7" (together, "Projects"). Each of the Projects consists of designing and building four, dormitory-style buildings known as "Bachelor Enlisted Quarters" ("BEQ") on Camp Pendleton. The Projects are thus sometimes referred to as "BEQ 4" and "BEQ 7." Combined, the Projects entail the designing and building of eight BEQs.

In the fall of 2008, NAVFAC solicited bids from general contractors who would both design and build the Projects. As is the case with design-build contracts, NAVFAC set forth the requirements for each of the Projects in a "Request for

---

[1] The Court **GRANTS** the parties' Joint Motion for Leave to File Extended Reply Brief, (ECF No. 141).

1 Proposal" ("RFP").  NAVFAC issued an RFP for BEQ 4 and an RFP for BEQ 7.[2]

2 In mid to late 2009, Turner-Penick was awarded the general contracts for both BEQ 4 and BEQ 7.  As was required to accept the award, Turner-Penick secured the proper performance and payment bonds through the Sureties.  Turner-Penick also set about hiring the various architects, engineers, and other subcontractors needed to design and build the Projects.  Among those with whom Turner-Penick contracted, was Comfort Systems.

In October and December of 2009, Comfort Systems entered into subcontracts with Turner-Penick for the design and construction of the heating, ventilation, and air conditioning ("HVAC") systems for BEQ 4 and BEQ 7 ("Subcontracts").  There are generally two types of HVAC systems: (1) a "through-wall" system, which provides conditioned air via small mechanical units that pass through an exterior wall of each room or unit in a building; and (2) a "central-air" system, which provides conditioned air from one large mechanical unit that is pumped through ducting to each room or unit in a building.

The core issue for purposes of this Motion for Partial Summary Judgment is whether Comfort Systems is entitled to additional payment for having to redesign the HVAC systems for BEQ 4 and BEQ 7.  Comfort Systems initially designed a through-wall system but was later required to change its design to include a central, make-up air system. Comfort Systems claims it is entitled to additional compensation for having to redesign the HVAC systems.  Comfort Systems contends the Project requirements were ambiguous with regard to whether a central-air system was required.  Comfort Systems bases its ambiguity argument on the following undisputed facts.

First, prior to Turner-Penick being awarded the BEQ 4 and BEQ 7 general contracts, Turner-Penick representatives were required to participate in a mandatory "job walk."  During this job walk, Turner-Penick representatives were shown BEQ 1,

---

[2] An RFP was first issued for BEQ 7 in January 2009, and an amended RFP was issued in July 2009.  See n.5, infra.

told BEQ 1 was a "Best of Breed Winner," and encouraged to use BEQ 1 as a starting point for any response to the RFPs for BEQ 4 and BEQ 7. BEQ 1 has a through-wall HVAC system.

Second, Holland—the Turner-Penick project director for both BEQ 4 and BEQ 7—has stated that, at the time Turner-Penick and Comfort Systems were entering into the BEQ 4 Subcontract, everyone agreed that Comfort Systems' proposed through-wall HVAC system should satisfy the RFP requirements for BEQ 4. Turner-Penick agreed the RFP requirements for BEQ 4 did not clearly communicate a requirement to provide a central-air system. And Holland later testified that, indeed, Comfort Systems had a "very compelling case" for why its through-wall system would satisfy the RFP requirements.

Third, Eugene Walsh of Walsh Engineering, Inc. believed Comfort Systems' proposed through-wall system would satisfy the RFP requirements. Walsh, who had been involved in nine federal projects similar to the Projects here, was asked by Turner-Penick to consult on whether Comfort Systems' initial HVAC design satisfied the RFP requirements.

Fourth, Jonathan Lundstrom (Comfort Systems' own mechanical engineer) reviewed the RFP requirements and concluded Comfort Systems' proposed through-wall system would satisfy the RFP requirements.

Fifth, when the NAVFAC issued its RFP for BEQ 8, NAVFAC made clear that a central-air HVAC system was required. This clarity distinguished the BEQ 8 RFP from the BEQ 4 and BEQ 7 RFPs.

Sixth, prior to NAVFAC's award of the BEQ 4 and BEQ 7 general contracts, other general contractors had requested information from NAVFAC regarding the required HVAC systems. Holland agreed that NAVFAC's response to these pre-bid requests for information were "[n]ot as clear as we would have liked."

Seventh, while drafting the BEQ 4 Subcontract, Comfort Systems crossed out requirements that were pertinent to central-air systems. The initial draft of the BEQ 7

Subcontract contained none of the requirements pertinent to central-air systems that Comfort Systems had crossed out in the BEQ 4 Subcontract. The final version of both Subcontracts, however, incorporated the requirements of their respective RFPs.

Eighth, shortly after the Subcontracts were executed, Turner-Penick sent NAVFAC a letter requesting that the BEQ 4 general contract be modified to permit Comfort Systems' to install its initially designed through-wall HVAC system.[3] This letter was based on: (1) NAVFAC's representations about BEQ 1 on the mandatory job walk, (2) Walsh's belief that Comfort Systems' initial design complied with the RFP, (3) Lundstrom's belief that Comfort Systems' initial design complied with the RFP, (4) the additional clarification NAVFAC provided in the BEQ 8 RFP as compared to the BEQ 4 and BEQ 7 RFPs, and (5) the deficient responses to the other general conrtractors' pre-bid requests for information. NAVFAC denied Turner-Penick's request.[4]

Turner-Penick and the Sureties now contend the contract documents were clear all along and that Comfort Systems is not entitled to any additional payment for its redesign of the HVAC systems for BEQ 4 and BEQ 7. Turner-Penick and the Sureties base their position on the contract documents themselves.

The Subcontracts each contain an "Attachment 'B,'" which in turn requires the HVAC systems for each of the Projects to be designed and built in accordance with, among other things, the RFPs for each of the Projects.[5]

---

[3] Turner-Penick and the Sureties object to the admissibility of this letter on authentication and hearsay grounds. The objections are **OVERRULED**. The letter is properly authenticated as an exhibit to Holland's deposition, and it is excluded from the definition of hearsay as an opposing party's statement.

[4] Comfort Systems' objection that the NAVFAC denial letter is inadmissible hearsay is **SUSTAINED**. The Court will not, therefore, consider the stated reasons for NAVFAC's denial. Holland, however, provides his own declaration that NAVFAC rejected Turner-Penick's request for a modification. (ECF No. 149, Holland Decl. ISO Reply ¶ 22.) The Court finds this undisputed evidence is sufficient to establish the fact that NAVFAC rejected Comfort Systems' initial design.

[5] The Subcontract for BEQ 7 was based on the January 2009 RFP—not the July 2009 RFP. Turner-Penick, however, was awarded the BEQ 7 general contract based on the July 2009 RFP. Thus, Turner-Penick and the Sureties provided only the July 2009 RFP in support of their Motion for Partial

The RFPs for BEQ 4 and BEQ 7 each contain "General Requirements." Section 01 33 10.05 20 of the General Requirements contains "Design Submittal Procedures." The Design Submittal Procedures incorporate, and require compliance with, the U.S. Department of Defense United Facilities Criteria ("UFC") for Mechanical Engineering, which is designated as UFC 3-400-10N.

In addition to the General Requirements, the RFPs each contain "Project Program Requirements." Like the Design Submittal Procedures, the Project Program Requirements also require compliance with UFC 3-400-10N.

Section 2-5 of UFC 3-400-10N pertains to "TERMINAL & PACKAGE UNITS."[6] Section 2-5.1 states:

> Do not provide room fan coil units or packaged terminal units, such as individual through-wall heat pumps, for facilities such as office buildings and Bachelor Quarters or for any facility larger than 465 square meters (5000 square feet), unless conditioned make-up air is provided to each space through a central, continuously operating, dedicated make-up air system. Conditioned make-up air shall be ducted to each room or to the return side of each fan coil or terminal unit.

---

Summary Judgment. Comfort Systems argues in opposition that the failure to provide the January 2009 RFP is a sufficient basis to deny Turner-Penick and the Sureties' Motion for Partial Summary Judgment, given that the BEQ 7 Subcontract incorporated the January 2009 RFP—not the July 2009 RFP. In reply, Turner-Penick and the Sureties offer undisputed evidence, in the form of Holland's Declaration, that the relevant provisions of the January 2009 RFP were unaltered in the July 2009 RFP. (ECF No. 149, Holland Decl. ISO Reply ¶¶ 6-13, 16.)

The Court **DENIES** Comfort Systems' Motion to Strike this Holland Declaration because the Declaration and the exhibits attached thereto are a reasonably foreseeable response to Comfort Systems' arguments in opposition to the Motion for Partial Summary Judgment. Further, the Court **OVERRULES** Comfort Systems' objection to this Holland Declaration on authentication/personal knowledge grounds because the Court finds Holland—as the Turner-Penick project director for BEQ 7 who has reviewed the January 2009 and July 2009 RFPs—has sufficient knowledge of the January 2009 and July 2009 RFPs to testify to their contents.

[6] The Court **DENIES** Turner-Penick and the Sureties' request that the Court take judicial notice of Section 2-5 of UFC 3-400-10N because UFC 3-400-10N itself states: "UFC are living documents and will be periodically reviewed, updated, and made available to users . . . ." (ECF No. 125-3 at 39.) Given the evolving nature of the UFC, the Court finds their provisions may be subject to reasonable dispute. And contrary to Turner-Penick and the Sureties' position, the UFC are not published in the Code of Federal Regulations but are instead "distributed only in electronic media from the . . . Whole Building Guide Design web site." (Id.) This makes judicial notice of the UFC inappropriate. See Fed. R. Evid. 201. Nevertheless, the Court finds the UFC attached to Holland's Declaration, along with Holland's undisputed statement that the attached UFC is a true and correct copy, to be sufficient evidence of the UFC 3-400-10N's provisions.

(ECF No. 125-4 at 124.[7]) Thus, both the General Requirements (through the Design Submittal Procedures) and the Project Program Requirements require compliance with UFC 3-400-10N.[8]

Turning to provisions of the Subcontracts themselves, Article I of the Subcontracts provides that Comfort Systems "shall perform and furnish all the work, labor, services, materials, . . . and other things necessary for . . . the Work . . . at . . . BEQ Package 4 . . . in <u>strict accordance</u> with the Additional Provisions and contract documents as listed Page 2, Attachment B, Additional Provisions, annexed hereto and made a part hereof." (ECF Nos. 125-1 at 10, 111 (emphasis added).)

Article II of the Subcontracts provides that Comfort Systems

> represents and agrees that it <u>has carefully examined and understands this Agreement and the other Contract Documents</u>, has investigated the nature, locality and site of the Work and the conditions and difficulties under which it is to be performed and that it enters into this Agreement on the basis of its own examination, investigation and evaluation of all such matters and <u>not in reliance upon any opinions or representations of Turner-Penick, or of the Owner [i.e., NAVFAC]</u>, or of any of their respective officers, agents, servants, or employees.

(<u>Id.</u> (emphasis added).) Article II further provides that Comfort Systems "agrees to be bound to Turner-Penick by each and all of the terms and provisions of the General Contract and the other Contract Documents, and to assume toward Turner-Penick all of the duties, obligations and responsibilities that Turner-Penick by those Contract Documents assumes toward the Owner . . . ." (<u>Id.</u>) Article II finally provides:

---

[7] When the Court cites to a page of a pleading or document filed with the Court, the Court refers to the CM/ECF page number.

[8] The Design Submittal Procedures for each of the RFPs also set forth an order of precedence to be applied if a conflict or inconsistency between the RFPs' various provisions arises. (ECF No. 125-3 at 15-16.) The provision, entitled "THE CONTRACT AND ORDER OF PRECEDENCE," provides: "The contract consists of the solicitation, the approved proposal, and the final design." The provision continues, "In the event of conflict or inconsistency between any of the below described portions of the <u>conformed contract</u>, precedence shall be given in the following order . . . ." (<u>Id.</u> at 16 (emphasis added).) Because the Order of Precedence applies only to the "conformed contract"—and because the "contract" is defined as including only the solicitation, the approved proposal, and the final design—it is clear that the Order of Precedence has no bearing on requirements contained in documents <u>other than</u> the "conformed contract." The Subcontracts are documents <u>other than</u> the "conformed contract." Thus, the Order of Precedence has no bearing on the Subcontracts.

> This Subcontract Agreement, the provisions of the General Contract and the other Contract Documents are intended to supplement and complement each other and shall, where possible, be thus interpreted. If, however, any provision of this Subcontract Agreement irreconcilably conflicts with a provision of the General Contract and the other Contract Documents, <u>the provision imposing the greater duty or obligation on the Subcontractor shall govern</u>.

(<u>Id.</u> (emphasis added).)

Article XXVIII of the Subcontracts provides:

> The Subcontractor hereby <u>guarantees the Work</u> to the full extent provided in the Plans, Specifications, General Conditions, Special Conditions and other Contract Documents.
>
> The Subcontractor shall expeditiously <u>remove, replace and/or repair at its own expense</u> and at the convenience of the Owner <u>any faulty, defective or improper Work</u>, materials or equipment existing or discovered within one (1) year from the date of the acceptance of the Project as a whole by the Architect and the Owner or for such longer period as may be provided . . . .
>
> Without limiting the generality of the foregoing, the <u>Subcontractor warrants</u> to the Owner, the Architect and Turner-Penick, and each of them, . . . that the Work performed pursuant to this Agreement will be <u>free from defects</u> and that the Work will <u>strictly conform</u> with the requirements of the Contract Documents. Work not conforming to such requirements, including substitutions not properly approved and authorized, shall be considered defective.

(ECF No. 125-1 at 19, 120 (emphasis added).)

## II.   Procedural History

Plaintiff Collins Plumbing, Inc. ("Collins") commenced this action when it filed its Complaint on December 5, 2011, against Turner-Penick and the Sureties. (ECF No. 1.) The next day, Collins filed its First Amended Complaint. (ECF No. 2.) And, on February 12, 2012, Collins filed its Second Amended Complaint. (ECF No. 14.)

On May 22, 2012, Turner-Penick and the Sureties filed their Answer to Collins' SAC, along with a counterclaim complaint against Collins and a third-party complaint against Comfort Systems and Walsh Engineering, Inc. (ECF No. 26.)

On July 19, 2012, Comfort Systems filed its Answer to Turner-Penick and the Sureties' Third-Party Complaint, along with a counterclaim complaint against Turner-Penick and the Sureties. (ECF No. 35.) On October 1, 2012, Comfort Systems filed

its currently operative First Amended Counterclaim Complaint against Turner-Penick and the Sureties for: (1) breach of BEQ 4 Subcontract against Turner-Penick, (2) recovery under Miller Act payment bond for BEQ Package 4 against the Sureties, (3) quantum meruit for BEQ Package 4 against Turner-Penick, (4) negligence in connection with BEQ Package 4 against Turner-Penick, (5) breach of BEQ 7 Subcontract against Turner-Penick, (6) recovery under Miller Act payment bond for BEQ Package 7 against the Sureties, (7) quantum meruit for BEQ Package 7 against Turner-Penick, (8) negligence in connection with BEQ Package 7 against Turner-Penick, (9) implied indemnity against Turner-Penick, (10) contribution against Turner-Penick. (ECF No. 62.)

On January 15, 2013, Turner-Penick filed its Answer to Comfort Systems' First Amended Counterclaim Complaint. (ECF No. 76.) On February 8, 2013, the Sureties filed their Answer to Comfort Systems' Counterclaim Complaint. (ECF No. 81.)

Turner-Penick and the Sureties now move for partial summary judgment on the discrete issue of whether Comfort Systems is entitled to additional compensation for its redesign of the BEQ 4 and BEQ 7 HVAC systems. If not, then Comfort Systems' redesign of the HVAC systems cannot serve as a basis for Comfort Systems' first, second, third, fifth, sixth, or seventh counterclaims against Turner-Penick and the Sureties. Though, because Comfort Systems bases these causes of action on alleged costs other than those incurred for the HVAC system redesign (e.g., the costs of repairing duct work that was damaged by other trades and the cost of applying anti-corrosion paint to all condensers), Turner-Penick and the Sureties' Motion will not fully dispose of any of Comfort Systems' counterclaims. The costs associated with the HVAC system redesign, however, represent the majority of damages claimed by Comfort Systems in its First Amended Counterclaim Complaint against Turner-Penick and the Sureties.

## **LEGAL STANDARD**

Summary judgment is appropriate where the moving party demonstrates the

absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. The moving party may satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23.

Where the party moving for summary judgment does not bear the burden of proof at trial, it may show that no genuine issue of material fact exists by demonstrating "there is an absence of evidence to support the non-moving party's case." Id. at 325. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact, nor is it required to offer evidence negating the moving party's claim. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 885 (1990); United Steelworkers v. Phelps Dodge Corp., 865 F.2d 1539, 1542 (9th Cir. 1989). "Rather, the motion may, and should, be granted so long as whatever is before the District Court demonstrates that the standard for the entry of judgment, as set forth in Rule 56(c), is satisfied." Lujan, 497 U.S. at 885 (quoting Celotex, 477 U.S. at 323). If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

If the moving party meets the initial burden, the nonmoving party cannot defeat

summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also Anderson, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted).

"Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987). "The district court may limit its review to the documents submitted for purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court need not "scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

The court may not make credibility determinations, and inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker Magazine, 501 U.S. 496, 520 (1991); see Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587.

## DISCUSSION

Turner-Penick and the Sureties argue they are entitled to partial summary judgment on the issue of whether Comfort Systems is entitled to additional compensation for its redesign of the HVAC systems for BEQ 4 and BEQ 7 because the Subcontracts unambiguously required Comfort Systems to design and build a central-air system. In other words, Turner-Penick and the Sureties argue Comfort Systems is not entitled to additional compensation for complying with what the Subcontracts already required. More specifically, Turner-Penick and the Sureties argue the

Subcontracts' terms require strict compliance with the RFPs, that the RFPs incorporate the UFC, the UFC require installation of a central-air system, and that—because the Subcontracts are integrated documents—the parol evidence rule bars consideration of any extrinsic evidence to vary or add to the Subcontracts' written terms.

In response, Comfort Systems does not take issue with Turner-Penick and the Sureties' explanation of the Subcontracts, RFPs, and UFC. Instead, Comfort Systems argues the "relevant provisions" of the RFPs are ambiguous as to whether a central-air system was required for BEQ 4 and BEQ 7. Comfort Systems also argues NAVFAC breached the implied warranty of correctness as to the required HVAC system, which in turn allows Comfort Systems to sue Turner-Penick for breach of contract. Comfort Systems further argues that, under the rule of practical construction, the Court should interpret Comfort Systems' obligations under the Subcontracts in accordance with the parties' conduct. Finally, Comfort Systems argues that, even if there were no ambiguity as to the required HVAC system, Comfort Systems entered the Subcontracts based upon a mistake of fact and that the Court should therefore reform the Subcontracts to reflect Comfort Systems' understanding of the required HVAC system.

## I. Ambiguity & Parol Evidence

"[P]arol evidence is properly admitted to construe a written instrument when its language is ambiguous." Winet v. Price, 4 Cal. App. 4th 1159, 1165 (1992).

> The decision whether to admit parol evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e. whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides th language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

Id. The threshold determination of ambiguity is a question of law, while any conflict amongst competent parol evidence is an issue of fact. Id. at 1165-66. The Court thus proceeds to determining whether, as Comfort Systems contends, the "relevant terms" of the RFPs are ambiguous. (ECF No. 128 at 17.)

Comfort Systems relies on the following facts in support of its argument that the RFPs are ambiguous as to the required HVAC system: (1) Holland's deposition testimony that the RFPs did not clearly communicate a requirement for a central-air system and that Comfort Systems had a "very compelling case" for why its initial design complied with the RFPs, (2) Turner-Penick's agreement that Comfort Systems' initial design should meet the RFP requirements, (3) Walsh's and Lundstroms' belief that Comfort Systems' initial design met the RFP requirements, (4) NAVFAC's subsequent clarification in the BEQ 8 RFP that a central-air system was required, and (5) Comfort Systems insistence that the Subcontracts not contain provisions related to a central-air system.

Notwithstanding the foregoing facts, Comfort Systems fails to identify any language in the Subcontracts, RFPs, or UFC that is ambiguous. Comfort Systems states only that the "relevant terms" of the RFPs are ambiguous. It is therefore impossible for the Court to determine whether the <u>language</u> of the RFPs is susceptible to Comfort Systems' interpretation.

Assuming Comfort Systems is arguing that Section 2-5.1 of UFC 3-400-10N is ambiguous, the Court disagrees. Section 2-5.1 states:

> Do not provide room fan coil units or packaged terminal units, such as individual through-wall heat pumps, for facilities such as office buildings and Bachelor Quarters or for any facility larger than 465 square meters (5000 square feet), unless conditioned make-up air is provided to each space through a central, continuously operating, dedicated make-up air system. Conditioned make-up air shall be ducted to each room or to the return side of each fan coil or terminal unit.

The plain language of Section 2-5.1 thus conditions the use of a through-wall system on providing a central make-up air system. Comfort System would nonetheless have the Court interpret this language as <u>not</u> requiring a central-air system where a through-wall system is used. In other words, Comfort Systems does not argue this language is ambiguous, as much as it argues the Court should ignore the provision entirely. Yet none of the extrinsic facts Comfort Systems relies on to create an ambiguity in this provision make this provision "reasonably susceptible" to Comfort Systems'

interpretation. This is because Comfort Systems' interpretation expressly contradicts the language of the provision. See Cont'l Baking Co. v. Katz, 68 Cal. 2d 512, 522 (1968) ("[E]xtrinsic evidence is not admissible in order to give the terms of a written instrument a meaning of which they are not reasonably susceptible."). Accordingly, the Court concludes Comfort Systems has not established an ambiguity in the Subcontracts, RFPs, or UFC.

## II.     Implied Warranty of Correctness

In the context of government contracts, the Supreme Court has recognized that, "[w]here one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforseen difficulties are encountered." United States v. Spearin, 248 U.S. 132, 136 (1918). "But if [a] contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." Id. This is the so-called Spearin doctrine, which the California Supreme Court articulated as follows:

> A contractor of public works who, acting reasonably, is misled by incorrect plans and specifications issued by the public authorities as the basis for bids and who, as a result, submits a bid which is lower than he would have otherwise made may recover in a contract action for extra work or expenses necessitated by the conditions being other than as represented.

Souza & McCue Constr. Co. v. Super. Ct. San Benito Cnty., 57 Cal. 2d 508, 510 (1962) (citing, e.g., Spearin, 248 U.S. at 136-37). "This rule is mainly based on the theory that the furnishing of misleading plans and specifications by the public body constitutes a breach of an implied warranty of their correctness." Souza, 57 Cal. 2d at 510-11. "In order to recover on such an action, the contractor must prove that the agency affirmatively misrepresented, or actively concealed, material facts which rendered the bid documents misleading, and that the contractor reasonably relied on such misrepresentations in preparing its bid." Thompson Pac. Constr., Inc. v. City of Sunnyvale, 155 Cal. App. 4th 525, 551 (2007) (citing Jasper Constr., Inc. v. Foothill

Junior College Dist., 91 Cal. App. 3d 1, 10 (1979)).

As set forth above, Comfort Systems has not demonstrated that an ambiguity exists in the Subcontracts, RFPs, or UFC. And Comfort Systems has offered no evidence that NAVFAC or Turner-Penick (to the extent that a subcontractor may recover against a general contractor for breach of the implied warranty of correctness) affirmatively misrepresented or actively concealed material facts. Accordingly, Comfort Systems may not base its breach-of-contract claims against Turner-Penick on a breach of the implied warranty of correctness.

### III. Practical Construction

"[W]hen a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court." Crestview Cemetery Ass'n v. Dieden, 54 Cal. 2d 744, 753 (quoting Universal Sales Corp. v. California etc. Mfg. Co., 20 Cal. 2d 751, 761 (1942)). In other words, a "practical construction" may be "placed upon the contract by the parties themselves, which renders it immaterial to consider what might be the literal construction of its terms." Crestview, 54 Cal. 2d at 754 (quoting Mitau v. Roddan, 149 Cal. 1, 14 (1906)). In such cases, the "ambiguity" arises from the parties' actions. Crestview, 54 Cal. 2d at 754.

While Comfort Systems has offered evidence demonstrating that it and Turner-Penick initially agreed that the RFPs did not clearly require a central-air system and that Turner-Penick sent NAVFAC a letter to that effect, Comfort Systems has offered no evidence demonstrating that—once NAVFAC rejected Comfort Systems' initial design shortly after Comfort Systems and Turner-Penick entered the Subcontracts—the parties' performance of the Subcontracts created any ambiguity in the contract documents. To the contrary, when Comfort Systems proceeded to install the HVAC systems in BEQ 4 and BEQ 7, it installed the required central-air system. In other words, Comfort Systems' performance ultimately complied with the plain language of

the contract documents. The Court thus concludes that Comfort Systems has failed to offer evidence demonstrating that the parties' performed the Subcontracts in a way that created an ambiguity in the Subcontracts' terms.

**IV.    Mistake of Fact**

Comfort Systems argues it is entitled to have the Subcontracts reformed to reflect Comfort Systems' interpretation of the HVAC system requirements. Comfort Systems argues that Turner-Penick and the Sureties should be estopped from taking a position that contradicts Turner-Penick's initial agreement that the RFPs did not clearly require a central-air system.

California Civil Code Section 3399 provides:

> When, through fraud or a mutual mistake of the parties, or a mistake of one party, which the other party at the time knew or suspected, a written contract does not truly express the intention of the parties, it may be revised on the application of a party aggrieved, so as to express that intention, so far as it can be done without prejudice to rights acquired by third persons, in good faith and for value.

"[T]he mistake of one party is a sufficient basis for reformation only when the mistake is known or suspected by the other party and, as a result, the writing does not truly express the intention of the parties." La Mancha Dev. Corp. v. Sheegog, 78 Cal. App. 3d 9, 16 (1978). "In the absence of actual knowledge or suspicion or, at the very least, actual knowledge or suspicion of a duly authorized agent imputed to the other party, there is no inequitable conduct on which to predicate an estoppel." Id. at 17. "[T]he knowledge necessary to constitute an estoppel must be actual knowlege [as opposed to constructive knowledge]." Id. (emphasis added).

Comfort Systems has offered no evidence that Turner-Penick had actual knowledge that Comfort Systems' initial design would not comply with the RFPs. Rather, the undisputed evidence demonstrates Turner-Penick was itself initially wrong about the required HVAC design. It was not until the Subcontracts were executed that NAVFAC rejected Comfort Systems' initial design. Thus, it cannot be said that Turner-Penick induced Comfort Systems into entering the Subcontracts, knowing

Comfort Systems' initial design was mistaken.

While there is no evidence of Turner-Penick inducing a unilateral mistake by Comfort Systems, there is evidence demonstrating Comfort Systems and Turner-Penick were mutually mistaken as to the required HVAC design at the time they entered the Subcontracts, such that the Subcontracts "do[] not truly reflect the intention of the parties." See Cal. Civ. Code § 3399. Turner-Penick's letter, outlining the parties' reasons for why Comfort Systems' initial design complied with the BEQ 4 RFP, is the most notable evidence demonstrating the parties were mutually mistaken as to the HVAC requirements. Thus, it may be appropriate to reform the Subcontracts to reflect the parties' apparent understanding of the HVAC requirements at the time they entered the Subcontracts. This conclusion is a sufficient basis on which to deny Turner-Penick and the Sureties' Motion for Partial Summary Judgment on the issue of whether Comfort Systems is entitled to additional compensation for having to redesign the HVAC systems for BEQ 4 and BEQ 7.

## CONCLUSION & ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that:

1. Turner-Penick and the Sureties' Motion for Partial Summary Judgment, (ECF No. 124), is **DENIED**;
2. Comfort Systems' Motion to Strike Declaration of David Holland, (ECF No. 139), is **DENIED**;
3. The parties' Joint Motion for Leave to File Extended Reply, (ECF No. 141), is **GRANTED**;
4. The hearing currently set for March 28, 2014, is **VACATED**.

DATED: March 27, 2014

HON. GONZALO P. CURIEL
United States District Judge